**AMOCO PRODUCTION CO.,**
Plaintiff–Appellant

v.

**Manuel LUJAN, Jr., Secretary of the Department of Interior, et al.,**
Defendants–Appellees.

No. 88–4797.

United States Court of Appeals, Fifth Circuit.

July 24, 1989.

George J. Domas, Matthew Kepner Brown, Liskow & Lewis, New Orleans, La., for plaintiff-appellant.

William B. Lazarus, Robert L. Klarquist, Dept. of Justice, Lands Div., Douglas Bowman, Dept. of Interior, Washington, D.C., for defendants-appellees.

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Director of the Minerals Management Service ordered Amoco to pay certain royalties upon gas produced by Amoco from land leased to it by the United States. The Interior Board of Land Appeals affirmed the Director's order. Amoco appealed the Board's decision in federal district court, contending that the Board had misinterpreted the regulations governing valuation of gas for royalty purposes, and had also misinterpreted valuation letters issued by the government. Amoco contended that the Secretary of the Interior Department was bound by the valuation letters, and that the Board had erroneously permitted the Secretary to value Amoco's production at a rate higher than that speci-

fied in the letters. Amoco also raised constitutional arguments, contending that the Secretary's efforts to escape the effect of the letters violated the Due Process Clause. On cross-motions for summary judgment, the district court rejected Amoco's arguments. Amoco now takes a further appeal to this court.

We find that the Board acted within its authority by concluding that federal regulations prohibited the federal officers charged with responsibility for valuing gas from delegating the authority to do so, and by further concluding that the construction of the letters contended for by Amoco would involve such a delegation. We therefore affirm the Board's conclusion that the Director retained discretion to value the disputed portion of Amoco's gas deliveries. We further find that the Director's valuation of the gas was a reasonable exercise of his discretion. We reject Amoco's argument that the Department's action in this case runs afoul of constitutional restrictions. The judgment of the district court is affirmed.

### I

#### A. The Factual Core

The Interior Department leases land to Amoco. When Amoco sells gas, the Department is entitled to royalties. The parties dispute how much is owed by Amoco to the Interior Department as a result of some sales by Amoco to Florida Gas Transmission Co.

The royalties due on Interior Department leases are computed in part on the basis of "valuation letters" issued by the Department to the lessee. The Department sent valuation letters to Amoco in connection with the lease in 1972 and 1973, when Amoco entered into a contract to sell gas from the lease to Columbia Gas Transmission Company. The question before us is whether those letters bound the parties to a particular royalty valuation with respect to the later sales to Florida Gas, and, if so, what that price was.

#### B. Regulatory Scheme

The Outer Continental Shelf Lands Act of 1953 (OCSLA), as amended, 43 U.S.C. §§ 1331 *et seq.*, authorizes the Secretary of the Interior to grant leases to private individuals or companies for the recovery of minerals, including oil and gas, from the subsoil and seabed of the Outer Continental Shelf. 43 U.S.C. § 1337. Under the Act, the Secretary is required to "assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a)(4). The Act authorizes the Secretary to require that lessees pay the government a percentage royalty "in the amount or value of the production saved, removed, or sold." 43 U.S.C. § 1337(a)(1)(A).

The Secretary is also authorized by the Act to "prescribe such rules and regulations as may be necessary and proper to carry out" the Act's provisions. 43 U.S.C. § 1334(a). Pursuant to this authority, the Secretary has issued regulations which establish the applicable standard for determining "the value of production" for royalty valuation purposes. In 1954, the Secretary issued 30 C.F.R. 250.64, a regulation directing the Supervisor of the United States Geologic Survey to determine production value for royalty valuation purposes:

> The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the lessee, to posted prices, and to other relevant matters. Under no circumstances shall the value of production of any of said substances be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major

portion of like-quality products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

30 C.F.R. 250.64 (1954–79).

The rule was unchanged until 1979, when it was amended to state explicitly that "the value of production shall never be less than the fair market value." 30 C.F.R. 250.64 (effective Dec. 13, 1979). The new rule sipulated that "the computation of royalty shall be determined by the Director" of the Minerals Management Service, and instructed the Director to "consider" certain factors "[i]n establishing the value":

> The value of production shall never be less than the fair market value. The value used in the computation of royalty shall be determined by the Director. In establishing the value, the Director shall consider: (a) the highest price paid for a part or for a majority of like-quality products produced from the field or area; (b) the price received by the lessee; (c) posted prices; (d) regulated prices; and (e) other relevant matters. Under no circumstances shall the value of production be less than the gross proceeds accruing to the lessee from the disposition of the produced substances or less than the value computed on the reasonable unit value established by the Secretary.

30 C.F.R. 250.64 (1979). In 1983 the rule was redesignated as 30 C.F.R. 206.150, and has since been amended again. Neither party contends that the subsequent amendment matters to the disposition of this lawsuit.

Both applicable versions of the regulation establish the gross proceeds obtained by the lessee as a floor for the royalty value of the gas produced, but posit a range of reasonable values from which the Director determines the "value of production" for royalty purposes in a specific case. The royalty value may properly be the minimum value, or may be above the minimum, based on consideration of the several listed factors, including the prices paid in other sales of like-quality products from the field or area.

Lessees are required by 30 C.F.R. 210.-150 (formerly designated first as 30 C.F.R. 250.46, and later amended and redesignated in 1969 as 30 C.F.R. 250.47), to "file with the Director, within 30 days after their effective date, a copy of all contracts, including all contract modifications (e.g., amendments and terminations), for the disposal of lease products." Lessees submit royalty payments on a monthly basis, 30 C.F.R. 218.50, subject to a later audit by the Royalty Compliance Office, 30 C.F.R. 217.200. The audit, which concerns the amount of royalties submitted, is informed in part by the monthly production and sales reports sent to MMS by the lessee, as well as royalty valuation letters which the Director may have issued with regard to particular contracts for the disposal of lease products.

### C. Factual Details

Amoco is a joint tenant of an Outer Continental Shelf lease from the Interior Department, called Lease OCS–G 1972. The lease was created in 1970 and did not originally involve Amoco; but Amoco succeeded to the interest of one of the lessees sometime before August 1972. Amoco has a half-interest in the lease, and must pay royalties accordingly.

In August 1972, Amoco submitted to the United States Geologic Survey (which the parties call, "USGS") a contract between Amoco and Columbia Gas for the sale of gas from the lease. The Geologic Survey returned a letter indicating that "payment on the gas for royalty purposes shall be based on the field delivery volume times the FPC–approved price, or a higher price, if received." The Geologic Survey sent another letter, pertaining to the same contract with Columbia Gas and containing similar language about royalties, in 1973. Until 1977, Amoco sold exclusively to Columbia Gas, and paid royalties based upon the price which the Federal Power Commission ("FPC," later succeeded by "FERC," the Federal Energy Regulatory Commission) had approved for those sales. The 1972 and 1973 letters are reprinted as appendices A and B of this opinion.

The import of the valuation letters is complicated further because Amoco's 1972 submission indicated that the Columbia Gas contract would cover only 50% of Amoco's production from the lease. The Geologic Survey's 1973 letter makes clear that the Department understood as much. However, Amoco had problems selling the remaining 50% because of difficulty closing a transportation contract with Columbia Gulf Gas Transmission Company. Amoco sorted matters out with Columbia Gulf in 1977, and then stopped selling to Columbia Gas, apparently in order to balance the 1972–77 deliveries with 1977–82 non-deliveries for the purpose of bringing total Columbia Gas deliveries down to the promised 50% of production.

The meaning and effect of these valuation letters is the heart of the dispute between Amoco and the Secretary. Amoco contends that the Survey's letters valued Amoco's gas production according to the FPC–approved price at which the gas was actually sold, regardless of to whom the gas was sold, so long as at least 50% of Amoco's total reserves from the lease were sold to Columbia Gas under the contract referenced in the letters. The Secretary contends that the letters' reference to "FPC–approved price" is a reference limited to the price approved for the Columbia Gas contract, or, alternatively, that the letters are void insofar as they authorize the valuation of gas at the FPC–approved price for an unspecified contract. This disagreement is important because Amoco eventually sold gas from the lease to Florida Gas Transmission at an FPC–approved price below the FPC–approved price for the Columbia Gas contract.

In 1977 Amoco began selling gas from the lease exclusively to Florida Gas Transmission. The Florida Gas sales were based on a 1964 contract between Amoco and Florida Gas. The 1964 contract had been submitted upon its creation to the Geologic Survey, but at that time Amoco did not know where the gas would come from. Of course, Amoco could not have predicted that the gas would come from the lease in question here, since that lease—much less Amoco's interest in it—did not exist at the time that Amoco submitted the Florida Gas contract.

There was an "FPC–approved price" for the gas sold by Amoco to Florida Gas. That price was lower than the FPC–approved price applicable to the Columbia Gas contract. Between 1977 and 1982, Amoco paid royalties based upon the FPC–approved price for the Florida Gas contract.

The Mineral Management Service Royalty Compliance Office audited Amoco at some point. The Compliance Office concluded that Amoco should have been paying royalties based upon the price approved for the Columbia Gas contract, not the Florida Gas contract. The RCO reasoned that the valuation letters sent in 1972—the only letters ever sent to Amoco in connection with the sale of gas from the land during the time period in question—referred to the "FPC–approved price" for the Columbia Gas contract, and not to the "FPC–approved price" for any contract pursuant to which Amoco made sales from the lease. The Compliance Office in 1982 demanded 1.458 million dollars from Amoco. Amoco contested the demand.

### D. The Proceedings

Amoco appealed the Director's decision to the Department's Interior Board of Land Appeals. The Board heard the case twice, and issued rulings sufficiently confusing that their meaning is a central question dividing the parties. In its first opinion, the Board relied on the 1979 amendment to 30 C.F.R. 250.64, which, according to the Board, preempted the otherwise binding effect of the valuation letters. On this ground, the Board upheld the Director's assessment of a deficiency.

Neither side agreed with this argument, and both sought rehearing. After consideration, the Board retracted its earlier argument, and put forward a new one. The parties contest the *ratio* of that decision. The Board's second opinion is reprinted as Appendix C to this opinion. Our interpretation of the Board's opinion is set out in Part III, below.

Amoco appealed the Board's determination to the federal district court for the Western District of Louisiana. The district court summarized the findings of the Board, and affirmed on the ground that the findings had a "rational basis" and so did not show "clear error." Amoco took an appeal to this court.

## II

■ Neither party questions our jurisdiction. We pause, however, to distinguish this case from *Amoco Production Co. v. Hodel,* 815 F.2d 352 (5th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), a very similar case involving the same parties. In that case, this Court dismissed the suit on the ground that it was a claim for money damages against the government cognizable only in the Claims Court. In the earlier case, however, Amoco had paid the demanded royalties, whereas here Amoco has refused to pay and has instead posted a bond. This difference is crucial, 815 F.2d at 361 n. 10 (jurisdiction turns on whether Amoco owes the fees, or instead seeks restitution of fees paid), and the district court so found. The government, which apparently pressed the jurisdictional issue in the earlier case, agrees. We find no jurisdictional defect in this case.

## III

■ Our review of the district court's decision granting summary judgment is *de novo.* On review of an agency adjudication, however, the reviewing court must in general affirm the decision unless the agency's action was "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). We must honor the agency's interpretation of the law authorizing agency action so long as the interpretation is a reasonable one. *Chevron U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The parties dispute the application of these standards to review of agency decisions interpreting

written contracts. Amoco contends that the interpretation of a contract may be reviewed *de novo.* Even without resolving this argument, we find it clear that our review of administrative issues depends upon the exercise of appropriate deference to the agency. We must therefore begin our inquiry by identifying the exact basis for the agency's action, including the extent to which the agency purports to interpret a written contract.

The interpretation of the Interior Board of Land Appeals' decision in this case is unusually difficult, and is a bone of contention between the parties. The Secretary appears to have relied upon three different theories—through the Director's original demand for royalties, and then the two Board opinions—in order to collect the royalties disputed by Amoco. Amoco contends that the Secretary's ultimate rationale in the second Board opinion, like the original rationale underlying the Director's post-audit charge, turns upon interpretation of the valuation letters. The Secretary contends that the rationale turns upon interpretation of the regulations governing the Department's valuation authority. In order to facilitate discussion of the issue, we have reprinted the two valuation letters and the second Board decision as appendices to this opinion.

We are largely in agreement with the Department's interpretation of the second Board opinion. The Board divided the royalty computation into two periods: the initial 5–year period (1972–77) when all the gas went to Columbia Gas, and the second period (1977–81) when all the gas went to Florida Gas. The Board's argument respecting both periods hinges on the fact that Amoco submitted to the Survey a contract for the sale of half of its gas to Columbia Gas, and that the Survey's valuation letters assumed that half of the gas would be sold to Columbia Gas. No contract governing the remaining portion of the gas was submitted to the Survey at any time after Amoco acquired its interest in the lease.

The gist of the Board's ruling is that during each period, the valuation letters

governed the royalty value of all gas produced by Amoco from the lease. However, during each period, 50% of the gas sold by Amoco was committed to Columbia Gas, and so had to be valued for royalty purposes at the FPC–approved price for the Columbia Gas contract. While the letters purported to value the remaining gas according to the FPC–approved price applicable to whatever contract it might be sold under, that valuation was, the Board held, void as an unauthorized delegation of the Director's responsibility to value gas on a case-by-case basis. The Director consequently retained discretion to value the gas pursuant to the regulations. The Board concluded that there was no abuse of discretion.

The Board arrived at this interpretation of the letters by the following reasoning. The Board first observed that during the initial period, 50 percent of the gas sold by Amoco was covered by the Columbia Gas agreement. The remaining 50 percent of Amoco's share during that first period was also sold to Columbia Gas. The royalties for this "remaining gas" were to be determined on the basis of "the value of equivalent gas as established by the Columbia Gas agreement." 94 IBLA 129, 130 (1986) (citing 30 C.F.R. 218.50). Amoco wished to assign some of the Columbia Gas sales to later years, and conversely assign later Florida Gas sales to the earlier years, but the Board concluded that "the value of production (for royalty purposes) is not subject to the accounting adjustment proposed by Amoco." *Id.*

The Board then confronted the more difficult second period, when all of Amoco's gas was sold to Florida Gas. The Board first reaffirmed its conclusion, announced in its original disposition of Amoco's arguments, that "[T]he valuation of the gas produced under lease OCS–G 1972 is governed by the August 1972 and March 1973 Survey value determination letters. Neither letter had been challenged or amended and they remained applicable for royalty determinations for gas produced during that time period." *Amoco Production Co.,* 94 IBLA at 131, *quoting Amoco Production Co.,* 85 IBLA 121, 127 (1985). The

context of the quoted passage from the Board's earlier opinion makes clear that the Board was finding that all of Amoco's production share, rather than merely the 50 percent attributable to the Columbia Gas contract, was governed by the valuation letters.

The Board went on to hold that because the valuation letters from 1972 and 1973 had never been rescinded, Amoco was bound to pay royalties on 50% of the gas produced from the lease as though the gas had been sold to Columbia Gas under the submitted contract. "[V]aluation of gas produced from lease OCS–G–1972 was governed by the value determination letters. We specifically find this to be the case for the 50 percent of Amoco's production committed to Columbia Gas. The Columbia Gas contract submitted by Amoco committed 50 percent of the production from OCS–G 1972 to Columbia Gas, and, for that portion of the production, the 1972 and 1973 letters were binding on MMS *and the producer,* unless and until rescinded and modified." 94 IBLA at 132 (emphasis in the original) (citing 30 C.F.R. 250.47). The Board refers to gas that is "committed," rather than gas that is "sold;" the Board is here referring to the period when *none* of Amoco's gas was in fact sold to Columbia Gas.

On this theory, because the contract committed Amoco to sell 50% of its production from the lease to Columbia Gas during the second as well as the initial period, and because the Board refused to permit the accounting adjustment whereby Amoco would assign sales from the initial period to the second period, 50% of the gas sold during the second (1977–82) period was to be valued according to the Columbia Gas contract.

This line of reasoning leaves only the second half of Amoco's gas sold during the second period unaccounted for. The Board then found that "for the 50 percent of the gas not committed to Columbia Gas, the royalty determination by MMS was clearly within the discretionary authority of the Secretary as set forth in 30 C.F.R. 250.64." 94 IBLA at 133. This conclusion relied on

the Board's nondelegation doctrine, developed earlier in the Board's opinion. Because 30 C.F.R. 250.64, both before and after amendment, required the Director (before amendment, the Supervisor) to make case-specific assessments of the royalty value of gas sold under particular contracts, the Director had no authority to delegate the valuation function to Amoco, or any other party, by valuing the gas according to any unspecified contract that Amoco might select. The valuation letters were for that reason void insofar as they purported to value half of Amoco's gas at the FPC–approved price for an as yet undetermined contract. Because the Survey's letters to Amoco could not delegate discretion to decide valuation of the gas, and because the second half of the gas sold to Florida Gas was not covered by the contract, the Director retained authority to set the valuation pursuant to 30 C.F.R. 250.64. The Board concludes its reasoning by finding that the Director did not abuse his discretion by valuing the gas sold to Florida Gas at the FPC–approved price for the Columbia Gas contract.

## IV

Once the Board's rationale is made clear, the complexity of this case largely dissolves. Amoco devotes much of its brief to argument about the meaning of the valuation letters. Yet the Board appears for the most part to have accepted Amoco's interpretation of the letters. The Board agrees with Amoco that the letters valued all of Amoco's production from the lease at the FPC–approved price of the contract under which the gas was actually sold. Amoco concedes that under the letters it was committed to sell half of its gas under the Columbia Gas contract, and that for royalty purposes it had to value half of its gas at the Columbia Gas contract price, even if none of the gas were sold to Columbia Gas. Amoco would apparently like to have the benefit of the accounting adjustment denied by the Board, but at no point in its appeal of the Board's decision has Amoco made any argument specifically directed at the Board's conclusion that the adjustment is impermissible for royalty valuation purposes.

After accounting for the apparent agreement between Amoco and the Board about the meaning of the letters, and likewise accounting for the aspect of the Board's interpretation not challenged by Amoco's appeal, the remaining controversy narrows considerably. At issue is only the valuation for royalty purposes of the second, "uncommitted" half of Amoco's sales to Florida Gas during the second of the two periods identified by the Board. But as our description of the Board's opinion should make clear, the Board's treatment of this portion of the gas depends not on a contested interpretation of the valuation letters, but rather on an interpretation of the agency's regulations that vitiates the effect of the letters. The Board's valuation of the "uncommitted" gas sold to Florida Gas accepts, rather than rejects, Amoco's interpretation of the letters. Despite the great ingenuity of Amoco's arguments, its efforts to characterize this suit as a contracts case fail.

■ Amoco is therefore bound by conventional administrative law standards of review, regardless of what we might think of Amoco's theories about the relation between contract law and administrative law. Amoco can defeat the Secretary's application of the Department's regulations to this case only by showing that application to be "arbitrary, capricious, or otherwise contrary to law." Judged by this standard, Amoco's arguments are unsuccessful. The Board's conclusions clearly derive from the text of 30 C.F.R. 250.64, which requires the "supervisor" to determine the value of production. The pre-amendment (up until Oct. 26, 1979) regulation said, "The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product *as determined by the supervisor.*" The post-amendment regulation says, "The value used in the computation of royalty shall be determined by the Director." There is nothing arbitrary or capricious about reading this language to impose a non-delegable duty upon the De-

partment to fix royalty valuation on a contract-by-contract basis.

It might still be possible to contend that the Board's construction of the regulation is nonetheless arbitrary and capricious because it permits the Department to benefit from its own misleading language—that is, by purporting to delegate its authority, the Department effectively "sets Amoco up" for a later decision retroactively establishing an unfavorable rate. However, a lessee which *presumes* a delegation, and fails to cover itself by submitting the contracts it intends to use to modify the valuation scheme, cannot claim to be the victim of double-dealing by the department. Lessees are under an obligation to "file with the supervisor within 30 days after the effective date thereof copies of all contracts for the disposal of lease products." 30 C.F.R. 250.47 (1969, since renumbered). Had Amoco re-filed the Florida Gas contract with the Survey before beginning to use that contract as the basis for its royalty payments, and had the Survey issued no valuation letter to supplement the letters issued in connection with the Columbia Gas contract, whether the Department could reasonably construe its regulations to give itself a "second shot" at setting the valuation rates might well give us pause.

This case differs, however, because Amoco did not resubmit the Florida Gas contract before beginning its sales to Florida Gas from lease 1972. Amoco points out that the Florida Gas contract had been submitted to the Survey in 1964, when executed, but the contract did not, and could not, then refer to the lease (which was not created until 1970). Without a subsequent notice to the Survey, tying the contract to the lease, there is no reason to believe that the Survey has indicated to Amoco that the Florida Gas contract may be used as a basis for the royalty computation. As the Board indicated in its opinion on rehearing, "While a copy of the Florida Gas contract had been submitted to MMS, there is ample evidence that there was no intent on the part of MMS to be bound by the terms of that contract with respect to the production from OCS–G–1972." 94 IBLA at 132.

It is true, as Amoco takes pains to point out, that the Florida Gas contract had been submitted to the Survey in 1964, and that 30 C.F.R. 250.47 did not appear to require resubmission of the contract. But the question we are now considering is *not* whether Amoco complied with 30 C.F.R. 250.47. Rather, the question is whether Amoco's submission of the Florida Gas contract renders "arbitrary and capricious" the Board's interpretation of 30 C.F.R. 250.64. And the answer to that question *does* depend upon when the Florida Gas contract was submitted.

### V

Finally, Amoco contends that the Board's ruling violates the Fifth Amendment, either because it is a confiscatory taking or because it "shocks our sense of fair play" and so deprives Amoco of substantive due process. Amoco relies heavily on two cases which are in fact predicated upon Texas law, not the federal Constitution. *See Flowers v. Diamond Shamrock Corp.*, 693 F.2d 1146, 1154 (5th Cir.1982), and *Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015, 1017 (5th Cir.1982) (both following *Exxon Corp. v. Middleton*, 613 S.W.2d 240 (Tex.1981)).

The only other case cited by Amoco in connection with its constitutional argument is *Boutte v. Chevron Oil Co.*, 316 F.Supp. 524 (E.D.La.1970), *aff'd*, 442 F.2d 1337 (5th Cir.1971), which is also inapplicable. *Boutte* was a procedural due process case pertaining to whether a particular royalty obligation became due prior to an FPC determination affecting the total proceeds from a sale, or whether the royalties on the contested portion of the proceeds became due only after the determination. By contrast, Amoco's argument here sounds not in procedural due process but in substantive due process. Amoco's constitutional argument thus has no support in precedent.

### VI

We can understand Amoco's objection to a valuation procedure that has the appearance of being both retroactive and unfavorable. Although we lack a detailed familiar-

ity with royalty practices in connection with offshore leasing, the events that precipitated this suit do not seem ideal. But we do not sit in review of agency action to determine what is ideal or best for the agency to do. The mandate of the federal courts is a narrower one, that of checking agency action which is "arbitrary and capricious, or otherwise not in accordance with law." Amoco's counsel has labored assiduously to show that the Department's action fails to conform even to this rather deferential standard. We are, however, unpersuaded.

For the reasons given, the judgment of the district court is in all respects

AFFIRMED.

## APPENDIX A

### GEOLOGIC SURVEY'S LETTER OF 8/31/72 TO AMOCO

Gentlemen:

We have received your Gas Purchase and Sales Agreement dated July 31, 1972, *with Columbia Gas Transmission Corporation, covering the sale of your share of the gas produced from lease* OCS–G 1972, East Cameron Block 33. In the future, it is necessary to send only one copy of these contracts.

Payment on the gas for royalty purposes shall be based on the field delivery volume times the *FPC–approved price,* or a higher price, if received.

In the event that this gas is processed, we shall require a copy of the processing agreement. Before processing begins, you will need to apply for an approved method of royalty payment for the processed liquids under 30 CFR 250.67.

Pursuant to 30 CFR 250.47, please forward a copy of the FPC certificate for the sale of this gas.

Sincerely,

Robert F. Evans
Oil and Gas Supervisor
Gulf of Mexico Area

cc:

Contracts File:

Buyer—Columbia Gas

Seller—Amoco (w/atch)

Lease OCS–G 1972

Accounting

FLBoyd: seh

## APPENDIX B

### GEOLOGIC SURVEY'S LETTER OF 3/9/73 TO AMOCO

Gentlemen:

Amoco owns 50% of lease OCS–G 1972, East Cameron Block 33, and Mobil has the remaining 50%. Amoco has committed 50% of its share of the gas from this lease to Columbia Gas, with the remaining 50% of its share being uncommitted at this time.

Processing of your above-committed gas will be accomplished in Amoco's South Pecan Lake Plant. The raw make from this plant is fractionated in Cities Service's Lake Charles Fractionation Plant. Cities Service charges Amoco fees for this fractionation as specified in your Hydrocarbon Fractionation Agreement, a copy of which you enclosed with your letter of February 20, 1973.

Effective with the initiation of processing at Amoco's South Pecan Lake Plant, the gas and plant liquids value for royalty purposes, pursuant to 30 CFR 250.67, for Amoco's share of the gas from the above lease shall be determined as the total of:

1. The plant product liquids value shall have a *base* factor of 45%. A certain fractionation and transportation charge shall be allowed as follows:

a. *For ethane:* The resulting value shall be 45% of the recovery volume times the price after fractionation minus $0.42 per gallon.

b. *For propane:* The resulting value shall be 45% of the recovery volume times the price after fractionation minus $0.52 per gallon.

c. *For butanes and heavier:* The resulting value shall be 39.825% (100.0% minus 11.5% times 45%) of the recovery volume times the price after fractionation, provided

the price is reasonable and in line with industry standards.

2. The gas value shall be the lease delivery volume times the FPC–approved price or a higher price if received, minus

3. The value, computed at the same price, of Plant Volume Reduction gas.

For royalty purposes, the total value shall not be less than the lease delivery volume times the FPC–approved price or a higher price if received.

Pursuant to 30 CFR 250.47, please send us a copy of the FPC certificate for the sale of this gas.

Sincerely yours,
D.W. Solanas
Acting Oil and Gas Supervisor
Gulf of Mexico Area

APPENDIX C

Text of IBLA Opinion: *Amoco Production Co. (on reconsideration)*, 94 IBLA 129 (1986).

OPINION BY ADMINISTRATIVE
JUDGE MULLEN

This is a reconsideration of this Board's opinion in *Amoco Production Co.*, 85 IBLA 121 (1985). In that case Amoco Production Company (Amoco) had appealed from a decision of the Director, Minerals Management Service (MMS), dated May 17, 1984, affirming an order issued by the Chief, Royalty Compliance Office, MMS, Tulsa, Oklahoma, dated September 20, 1982 (revised October 5, 1982), requiring payment of $1,435,852.97 in additional royalties for natural gas produced under lease OCS–G 1972, East Cameron Block 33, Offshore Louisiana, during the period from September 1977 to October 1981. The facts of the case, which have been set forth in detail in *Amoco Production Co., supra*, are not in dispute.

MMS and Amoco Production Company (Amoco) have filed petitions for reconsideration. By order dated May 31, 1985, the Board agreed to reconsider its prior decision and ordered briefing. Both petitioners seek clarification of four points set forth in *Amoco Production Co., supra.* These points are: (1) Do the value determination letters dated August 31, 1972, and March 1973 establish the proper value basis under the regulations for computing Amoco's royalty for its share of production from Outer Continental Shelf oil and gas lease OCS–G–1972? (2) Were the value determination letters superseded by 30 CFR 250.64 (1982)? (3) Were the value determination letters contrary to 30 CFR 250.64 (1982)? (4) To what extent, if any, does 30 CFR 250.64 (1982), restrict the MMS discretionary power to set a binding royalty value? This opinion will discuss the first two issues at some length. Because of our holding on the first two questions, we do not deem it necessary to address the arguments presented by the parties with respect to the second two.

The fact that the Florida Gas contract was submitted to the Geological Survey on June 29, 1966, is not in dispute. There is also no dispute that, when submitted, it was not the intent of the parties that the Florida Gas contract would be applied to gas produced from OCS–G–1972. In July 1972 Amoco submitted the Columbia Gas contract to MMS for royalty calculation purposes. This contract, which committed 50 percent of the gas produced from OCS–G–1972 to Columbia Gas, was designated as the proper value basis for royalty determinations in the August 31, 1972, value determination letter.

Part of the problem in the analysis of the facts on appeal arises from the fact that Amoco owned 50 percent of the production from OCS–G–1972. The commitment under the approved contract was for 50 percent of the production. Amoco contends that it committed only 50 percent of its share of the production (*i.e.*, 25 percent of all production), leaving the remaining 50 percent of its share of production uncommitted. For 5 years 100 percent of Amoco's share of the production from the well was delivered to Columbia Gas. In 1977 the Federal Power Commission (FPC) approved the Columbia Gulf contract which, according to Amoco, was to cover the remaining 50 percent of its interest which it contends was not committed to Columbia

Gas. According to Amoco, the Columbia Gulf agreement was for onshore delivery of gas to Florida Gas in partial satisfaction of the Florida Gas agreement. Amoco then delivered all of its production to Columbia Gulf and calculated the royalty pursuant to the Florida Gas agreement. The stated purpose for doing so was to reduce that portion of the gas produced from the well and sold to Columbia Gas to 50 percent of Amoco's *total* production. However, even if we were to accept this argument, the value of production (for royalty purposes) is not subject to the accounting adjustment proposed by Amoco. Rather, royalties are calculated and paid monthly, and the effect of the sale to Columbia Gas during the initial 5-year period, for purposes of determining the basis for royalties, would be: (1) For 50 percent of the gas produced—the Columbia Gas agreement; (2) for the remaining gas—the value of equivalent gas as established by the Columbia Gas agreement. *See* 30 CFR 218.50.

The question we must now consider is whether, during the 1977 through 1981 period, the price actually paid for the product or a higher price represents the value for royalty computation purposes. It is clear the Secretary is not limited to the actual value received, and we reaffirm the finding made in our initial decision: "[T]he valuation of the gas produced under lease OCS–G 1972 is governed by the August 1972 and March 1973 Survey value determination letters. Neither letter had been challenged or amended and they remained applicable for royalty determinations for gas produced during that time period." *Amoco Production Co., supra* at 127.

We again find and hold that MMS has regulatory authority to accept a FPC approved contract for royalty basis determination. If the FPC approved contract is designated as being applicable to production from a specific well, whether by the contract terms or by MMS, the FPC contract price will be binding on MMS, unless and until MMS rescinds or amends its ac-

ceptance of such valuation basis. Nothing in the original *Amoco* decision was intended to limit the discretionary decisionmaking authority of the Secretary or his authorized agents, if that authority is properly exercised. However, a value determination letter cannot be construed in a manner which would result in the delegation to a lessee of the discretionary authority to set the value of gas sold.

The value determination letters provide that the value production shall be the "FPC approved price, or a higher price, if received." Appellant urged this Board to accept the Florida Gas price, because the Florida Gas contract had received FPC approval and no higher price had been received. Appellant argues the Florida Gas price was binding because it was an FPC approved price, as set forth in the value determination letters. However, the MMS discretionary authority to allow calculation of the royalty pursuant to an FPC approved sales price does not extend as far as appellant would like it to be extended. To do so would be contrary to *both* the regulation as now in effect, and the regulation in effect prior to the 1979 amendment.[1] If the royalty determination were made on the basis of the Florida Gas contract, merely because the Florida Gas contract had FPC approval, it would result in a de facto delegation of the MMS responsibility for making a royalty determination (after considering *all* of the factors found in 30 CFR 250.64) and would be contrary to the regulation. The above quoted language in the value determination letters cannot be used as the basis for a finding by MMS or this Board that *any* FPC approved contract chosen by Amoco would, by reason of Amoco's election, become binding on MMS until such time as MMS would rescind Amoco's determination.

With the above in mind, we make the following observations regarding the prior *Amoco* opinion. As noted above, 30 CFR 250.64 provides the criteria MMS is to ap-

---

1. The only basis by which the supervisor (or this Board) could find the Florida Gas contract to be applicable would be pursuant to that language of the regulation in effect until 1979, which states: *"In the absence of good reason to the contrary, * * *."* 30 CFR 250.64 (1977) (emphasis added).

ply when calculating royalty value. Between September 1977 and October 26, 1979, the applicable regulation, 30 CFR 250.64, stated:

§ 250.64 Value basis for computing royalties.

The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the lessee, to posted prices, and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

On October 26, 1979, this regulation was amended, and the following language adopted:

§ 250.64 Value Basis for computing royalties.

The value of production shall never be less than the fair market value. The value used in the computation of royalty shall be determined by the Director. In establishing the value, the Director shall consider: (a) The highest price paid for a part or for a majority of like-quality products produced from the field or area; (b) the price received by the lessee; (c) posted prices; (d) regulated prices; and (e) other relevant matters. Under no circumstances shall the value of production be less than the gross proceeds accruing to the lessee from the disposition

of the produced substances or less than the value computed on the reasonable unit value established by the Secretary. 30 CFR 250.64 (1980); 44 FR 61886 (Oct. 26, 1979).[2] The above language remained in effect for the balance of the period in question. As we found in *Amoco, supra* at 127, valuation of gas produced from lease OCS–G–1972 was governed by the value determination letters. We specifically find this to be the case for the 50 percent of Amoco's production committed to Columbia Gas. The Columbia Gas contract submitted by Amoco committed 50 percent of the production from OCS–G–1972 to Columbia Gas, and, for that portion of the production, the 1972 and 1973 letters were binding on MMS *and the producer,* unless and until rescinded or modified. *See* 30 CFR 250.47 (1982). While a copy of the Florida Gas contract had been submitted to MMS, there is ample evidence that there was no intent on the part of MMS to be bound by the terms of that contract with respect to the production from OCS–G–1972. This fact is clearly reflected by the conduct of the parties in the 5–year period preceding the audit period. Finally, we find, for the 50 percent of the gas not committed to Columbia Gas, the royalty determination made by MMS was clearly within the discretionary authority of the Secretary as set forth in 30 CFR 250.64. It is based upon a regulated price (pursuant to the Columbia Gas contract) for the product of the well which has been accepted by the parties as being either the "estimated reasonable value" (pre–1979) or "fair market value" (post–1979).

The remaining two questions raised by the parties, as outlined above, point to a problem, which arises not from the Board's holding in the decision cited as *Amoco Production Co.,* 85 IBLA 121 (1985), but from dicta in that decision. Beginning with footnote 3 at page 128, and continuing with the text of the first paragraph on page 129, the Board's discussion of the effect which the amendment of 30 CFR 250.64 may have had upon the 1972 and 1973 value determination letters, and the effect of the regula-

**2.** This regulation was redesignated as 30 CFR 206.150 in 1983. 48 FR 35641 (Aug. 5, 1983).

tory amendment itself, were unnecessary to the decision of this appeal and have been criticized by both parties in their requests for reconsideration of the decision. Both parties have noted the possibility that these portions of the decision can be construed as being inconsistent with the Board's holding in this case. Upon reconsideration we recognize this discussion unnecessarily detracted from the holding by the Board. Accordingly, we hereby strike footnote 3 and the first paragraph on page 128 of the decision. The remainder of the Board's decision in *Amoco Production Co., supra,* is affirmed, as clarified by this decision. The Board specifically reaffirms the prior holding that the value of production for all of the gas from lease OCS-G-1972 during the 1977 through 1981 period involved was the price set in the Columbia Gas contract and approved by the August 1972 and March 1973 Survey letters, since no higher price was received.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision in *Amoco Production Co.,* 85 IBLA 121 (1985), is affirmed as modified by this decision.

R.W. Mullen
Administrative Judge

I concur:

Franklin D. Arness
Administrative Judge

ADMINISTRATIVE JUDGE IRWIN CONCURRING IN THE RESULT:

Our holding holds and our dicta do not: that is all the parties ask us to clarify and all we need to say.

Will A. Irwin
Administrative Judge