**CALIFORNIA COMPANY, Plaintiff,**

v.

**Fred A. SEATON, Secretary of The Interior, Defendant.**

**Civ. A. No. 980–59.**

United States District Court
District of Columbia.

Oct. 6, 1960.

446

Marvin J. Sonosky, John S. White, Washington, D. C., for plaintiff.

Thomas L. McKevitt, Dept. of Justice, Washington, D. C., for defendant.

WALSH, District Judge.

This matter comes before the Court on a complaint for review, for declaratory judgment, and for injunctive relief. It arises from a decision rendered by the Secretary of the Interior with respect to oil and gas lease royalty determinations.

The land in suit here is located in the Romere Pass Field in southern Louisiana, and is covered by four oil and gas leases, effective March 1, 1949, issued by the United States to the individual lessees under authority of the Mineral Leasing Act for Acquired Lands, 30 U. S.C.A. § 351 et seq., and governed by the leasing procedures of the Mineral Leasing Act of 1920, as amended, 30 U.S.C.A. § 22 et seq. In February of 1949 each of the lessees executed an operating agreement with the plaintiff.

On July 31, 1951, the plaintiff, The California Company (the gas seller), entered into a contract with the Southern Natural Gas Company (the gas buyer) for the sale of its gas from the Romere Pass Field and other fields in southern Louisiana. This contract is for a term of 25 years and specifies a price of 12¢ per m. c. f. (1000 cubic feet) of gas for the first five years (April 1, 1954 to March 31, 1959) after the first delivery. Thereafter the price escalates each five years until a price of 16¢ per m. c. f. of gas is reached. The contract calls for delivery by plaintiff of gas suitable for transmission in the buyer's pipeline. The contract price was based on a gas that would not contain (1) in excess of 0.007 pounds of water per m. c. f.; (2) nor in excess of 0.2 gallons liquefiable hydrocarbons per m. cl f.; and (3) that it would be delivered to the buyer's pipeline at a pressure selected by the buyer

but not to exceed 800 p. s. i. (pounds per square inch).

According to the plaintiff, the operational procedures at the Romere Pass Field necessary to handle the gas from the well to the gas buyer's pipeline consist of (a) separation, (b) compression, and (c) dehydration. It is the plaintiff's position that royalties may not be charged on costs and expenses incurred beyond the separation procedure, and plaintiff contends that it may deduct from the contract price certain charges representing the costs of gathering, compression and dehydration in order to arrive at a value for royalty computation. Plaintiff's computation is as follows:

| | |
|---|---|
| Contract price | 12.00 per m. c. f. |
| Gathering | .3 per m. c. f. |
| Compression at 1.5¢ per stage | 4.5 per m. c. f. |
| Dehydration | .25 per m. c. f. |
| Price on which Plaintiff computes royalty | 6.95 |

Thus, in determining the royalty due the Government, the plaintiff would deduct costs totaling 5.05¢ per m. c. f. from the contract price of 12¢ and pay the royalty on 6.95¢ per m. c. f.

With the delivery of gas to the buyer in late 1953 and early 1954, the Supervisor, Gulf Coast Region, U. S. Geological Survey, sent monthly statements of royalty due the United States on the basis of 12½ per cent of the 12¢ per m. c. f. The California Company did not honor the Supervisor's determination and made payments on the basis of 12½ per cent of 6.95¢.

Correspondence was carried on between the parties with respect to the matter until May 21, 1957, at which time the Supervisor notified The California Company that failure to make royalty payments on the price of 12¢ per m. c. f. "constitutes non-compliance with the oil and gas operating regulations and a penalty for such non-compliance is provided in 30 CFR 221.53. If this default is not rectified within 30 days from receipt of this order to make delinquent royalty payments, the authority stated in 30 CFR 221.53 will be exercised. Your attention is called to a right of appeal from this order as provided in 30 CFR 221.66". The Supervisor's final notification was delayed until May 21, 1957, pending the outcome of an appeal filed by The Texas Company, 64 I.D. 76 (1957), involving a similar question, and which was decided adversely to the lessee.

On June 6, 1957, the plaintiff appealed to the director, Geological Survey, and on September 27, 1957, the Director denied the appeal and affirmed the Supervisor. With respect to the deductions for gathering and compression which plaintiff claims in its computation to determine royalty due the Government, the decision of the Acting Director states:

"1] Gathering 'charge' applies only to movement of gas from tank battery stations Nos. 2 and 3 to tank battery station No. 1. Gas flowing directly from wells to tank battery station No. 1 not subject to this deduction.

"2] It is not necessary to compress all gas produced in the field in order to raise it to the required 1000 p. s. i. pressure. It is estimated that about 70 percent of the gas is produced at a pressure sufficiently high that compression is unnecessary."

On appeal to the Secretary of the Interior, the decision of the Acting Director was affirmed on February 20, 1959.

Meanwhile, in May of 1959, the plaintiff paid under protest into a suspense account $50,000, the balance of the royalties the Government claimed was due. Since that date the plaintiff has paid the disputed amounts into the same suspense fund.

The sole question presented here is whether the decision of the Secretary of the Interior is within his statutory and regulatory authority and in accordance with the terms of the contract where the Secretary finds that the royalties due

the United States under the lease are to be computed on a figure of 12¢ per m. c. f., which price is also the contract price at which the plaintiff sells the gas in question to the buyer and which the plaintiff alleges includes the costs incurred by it in making the gas suitable for the buyer's pipeline.

For the reasons hereinafter indicated, it is the Court's opinion that the decision of the Secretary must stand (1) if it comes within the standards set by Congress in section 17 of the Mineral Leasing Act, and is authorized by and in compliance with that Act; (2) if the determination is in accordance with the Secretary's regulations which he is authorized by law to make; (3) if the contract between the Government and the plaintiff expressly reserved to the Secretary the power to fix the value of production of the gas lease at 12¢, and the determination is in accordance with the terms of said contract; and (4) if there is a reasonable and rational basis for the Secretary's determination.

Under section 17 of the Mineral Leasing Act, as amended, 30 U.S.C.A. § 226, whenever, as in this case, the lands involved in the oil and gas lease are not located within any known geological structure, the leases made by the Secretary of the Interior are non-competitive, and the Act provides that "Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease."

Moreover, the Secretary, under the provisions of 30 U.S.C.A. § 189, is "authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes [among other things] of sections * * * 223–229 * * *". Also, since so-called acquired lands (i. e., purchased as distinguished from public domain) are here involved, it is important to note that the Secretary of the Interior is authorized to lease these Government lands "under the same conditions as contained in the leasing provisions of the mineral leasing laws, subject to the provisions [t]hereof." 30 U.S.C.A. § 352. Because this was an acquired land lease, the Secretary of the Interior could not negotiate the lease without the approval of the executive department or independent establishment (The Bureau of Land Management, in this case) having jurisdiction over the lands.

As noted, the Mineral Leasing Act provides for the Secretary to enter leases calling for the payment by the lessee of a royalty "in amount or value of the production". This term or phrase is not defined in the Act, and the legislative history of the Act is not helpful in defining the term. "Value" has been variously defined, but in the context in which it appears in this statute it is considered that it generally means "estimated or assessed worth" or "marketable price". 91 C.J.S. Value, p. 799. The courts on various occasions have held that "value" ordinarily means "market value", "fair market value", or "market value fairly determined". Pewee Coal Co. v. United States, 1958, 161 F.Supp. 952, 956, 142 Ct.Cl. 796. The word "production" meanwhile has been held to be a broad term which may designate a thing produced as well as the operation of producing. 72 C.J.S. Production, p. 1211. In a case involving the interpretation of an assignment of an oil and gas lease requiring development to a normal state of "production", Cole Petroleum Co. v. United States Gas & Oil Co., 1931, 121 Tex. 59, 41 S.W.2d 414, 416, the court construed the term as follows:

"Looking to all the terms of the contract, developing the lease to a normal stage of production necessarily involved marketing oil or gas discovered in paying quantities in order to yield part of the oil or cash for the gas to the assignor, as well as profit to the assignee. * * * The stage of production was not reached by the preliminary steps of exploration and discovery. Successful exploration and discovery lay the basis for marketing of gas in such a state as to have a value and

to command a price. Black's Law Dictionary defines 'production' in political economy as 'the creation of objects which constitute wealth'. Gas or oil connected with a pipe line or other means of transportation to market is an object which constitutes wealth."

One of the Secretary's statutory duties and functions is to make the acquired lands of the Government productive by entering into gas and oil leases with individuals and then setting a royalty of not less than 12½ per cent of the value of production. 30 U.S.C.A. § 226. The Secretary cannot effectively perform this duty without rather wide discretion to determine what the value of production will be. As noted above, the term "value of production" does not defy interpretation and there is authority for its close identification with a market or contract price.

 It is the Court's opinion, therefore, that the Secretary's base for the computation of royalty of 12¢ can be said to be one based on the "value of production", and is thus pursuant to section 17 of the Act, if, as is found later in this opinion, the determination is not arbitrary or capricious. The Court also finds that the language found in section 17 of the Act contains statutory guides which are sufficiently specific standards as to be sustainable against claims of unconstitutional delegation of legislative powers. Davis, 1 Administrative Law Treatise, §§ 2.03, 2.16. Continental Oil Co. v. United States, 9 Cir., 1950, 184 F.2d 802.

As noted earlier, the Secretary is authorized to make regulations to accomplish the purposes of Section 226 (sec-tion 17 of the Act).[1] Such regulations have been held by the Courts to have the force and effect of statutes when not inconsistent with or repugnant to such statutes. Hodgson v. Midwest Oil Co., D.C.Wyo.1924, 297 F. 273.

The pertinent operating regulations (Geological Survey) issued by the Secretary of the Interior relating to the determination of "value of production" appearing in 30 Code of Federal Regulations, read as follows:

"§ 221.47 *Value basis for computing royalties.* The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value."

---

1. Congress in enacting the 1954 amendment to section 17, while attempting to set rules, recognized the difficulty in trying to set up legislative rules. House Report No. 2238, U.S.Code Cong. & Adm. News, 1954, p. 2696:

"It is recognized that a certain amount of administrative discretion and flexibility are necessary. Oil and gas are found under a great variety of types of terrain and localities. Many different and highly technical factors may be controlling in different cases. Legislative rules and standards which would be fair and equitable in one case might well prevent any operations at all in another. Therefore, the Secretary of Interior must have administrative discretion to deal with particular problems in particular areas as they arise."

"§ 221.50 *Royalty on gas.* The royalty on gas shall be the percentage established by the terms of the lease of the value or amount of the gas produced.

"(a) Royalty accrues on dry gas, whether produced as such or as residue gas after the extraction of gasoline.

"(b) If the lessee derives revenue on gas from two or more products, a royalty normally will be collected on all such products.

"(c) For the purpose of computing royalty the value of wet gas shall be either the gross proceeds accruing to the lessee from the sale thereof or the aggregate value determined by the Secretary of all commodities, including residue gas obtained therefrom, whichever is greater."

The pertinent royalty regulation involved here, 43 CFR 192.82, reads in part as follows:

"§ 192.82 *Royalty on production*

\* \* \* \* \* \*

"(c) In determining the amount or value of gas and liquid products produced, the amount or value shall be net after an allowance for the cost of manufacture. The allowance for cost of manufacture may exceed two-thirds of the amount or value of any product only on approval by the Secretary of the Interior.

"(d) The Secretary of the Interior may establish reasonable values for purposes of computing royalty on any or all oil, gas, natural gasolines, and other liquid products obtained from gas, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. In appropriate cases this will be done after notice to the parties and opportunity to be heard."

One of the expressed purposes of section 17 of the Act is the recovery of royalties on gas leases based on the value of production. The operating regulation entitled "Value basis for computing royalties", 30 CFR 221.47 (quoted above) sets forth with some clarity the Secretary's guide lines for determining "value of production" when it states that it shall be the "estimated reasonable value of the product as determined by the supervisor", that due consideration must be given by the supervisor to, among other things, the "price received by the lessee", and to the provision that under "no circumstances shall the value of production of any of said substances for the purposes of computing royalty to be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof \* \* \*".

Operating regulation 30 CFR 221.50 also applies the "gross proceeds" provision to the value of wet gas, while royalty regulation 43 CFR 192.82 is somewhat similar to portions of 30 CFR 221.47 in its establishment of guidelines for the supervisor. A review of these regulations leads the Court to the conclusion that they are not inconsistent with nor repugnant to the statutes here involved, and that the Secretary was within his regulatory authority in setting the base for computing royalties due the Government at 12¢ per m. c. f., absent, as the Court finds, arbitrariness and capriciousness in such determination.

In the instant case there is also a contract (lease) which controls the rights of the respective parties to this controversy. That contract, section 3(e), expressly reserves to the lessor the right "to take royalties in amount or value of production." That the Secretary has authority to insert such a reservation of a right to determine and fix these values seems to be settled law.[2] United States v. Ohio Oil Co., 10 Cir., 1947, 163 F.2d

---

**2.** See 17 C.J.S. Contracts § 319, where it is noted, in effect, that if there is no ambiguity in a contract it is the law of the parties and its terms will be enforced no matter how onerous it may be if that is the clear intention of the parties.

633. See also Continental Oil Co. v. United States, supra.

Each lease, section 2(d) (2), also expressly provides that the Secretary of the Interior has the right to "establish reasonable minimum values for purposes of computing royalty on any or all * * gas * * * and other products obtained from gas; due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters * * *." Additional provisions on royalty appear in Schedule A [royalty on production] of the lease. Also, the preamble to each lease states that such lease will be subject to all reasonable regulations issued under the authority of the Act of August 27, 1947.

The opinion of the Acting Solicitor in The Texas Company, 64 I.D. 76 (April 1, 1957), relied on by defendant, states:

" * * * It [The Texas Company] admits that the gas when it comes from the wells is in an unmarketable condition but contends that when the gas is separated from the oil, which it admits is a part of the lease operation, the gas is in a marketable condition and that it needs no further treatment to be marketed. However, the appellant also states that the gas cannot be marketed until the pressure of the gas has been stepped up so that it can enter the market. It argues that the compression necessary to accomplish this cannot be called a process to change the condition of the gas to put it in a marketable condition because, it says, it is already in that condition when it leaves the separator. Appellant states that the facilities for the use of which the deductions were made are marketing facilities, and being such, the charge for the use of such facilities should have been allowed.

\* \* \* \* \* \*

"However, it would seem to be immaterial, for the purposes of this decision and under the provisions of the lease here involved, at which point the gas is determined to be in a marketable condition—when it leaves the separator or when the gas is under sufficient pressure to enter the market. The lease requires the lessee to market the production from the lease and until the gas from the wells is in such a condition that it can be sold in the market, it cannot be said that the lessee has fulfilled his obligations under the lease. The lessee has not shown that the gas can be marketed at the pressure with which it comes from the wells.

"The appellant's duty to market the gas is not a covenant read into the lease by implication as was the situation in many of the cases cited by the appellant. Here the duty is expressly imposed under the terms of the lease. Section 2(m) of the lease makes the regulations of the Secretary of the Interior a part of the lease. One of those regulations (30 CFR 221.35) obligates the lessee to prevent the waste of oil or gas. To avoid the physical waste of gas, the lessee is required to consume it beneficially, *to market it*, or to return it to the productive formation. Another regulation (30 CFR 221.47) provides that the value of production, for the purposes of computing royalty, shall under no circumstances be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof. Still another regulation (30 CFR 221.51(b)) sets forth the policy of the Department not to allow for the cost of boosting residue gas after the extraction of liquid hydrocarbon substances and not to allow other expenses incidental to marketing. While we are not confronted here with an allowance for the cost of boosting residue gas after the extraction of other substances, the appellant has advanced no sound reason why it should be relieved of this cost of marketing its oil well gas

when a lessee whose production goes to an extraction plant is required to bear the cost of boosting and other expenses incidental to the marketing of that residue.

"In fulfillment of its express duty to market its gas, the appellant made a contract for the sale thereof. It agreed to deliver the gas at a given pressure presumably in order to sell the gas. It cannot reasonably expect the lessor to assume the cost of meeting the lessee's obligation in this respect."

In the instant case, the Acting Director, Geological Survey in his opinion, took the position that the instant case was ruled by the decision in The Texas Company, supra, when he stated:

"Much the same situation exists with respect to the situation in the Romere Pass field. The lessee has an express obligation to market the gas produced. In order to fulfill this obligation the lessees entered into a sales contract; such contract calling for the gas to be delivered at a given point in the Romere Pass field, at a specified pressure, and in certain condition with respect to its liquid hydrocarbon and water-vapor content. Article 7 of the contract specifically provides, 'Seller, at its expense, shall install and operate and maintain such facilities for the compression of gas from each of the fields as may be necessary to deliver hereunder the maximum take specified. * * *' It is the obligation of the lessee, not the United States, to meet the terms of this contract.

"Each of the deductions charged by The California Company for the purposes of computing royalty is for operations performed to place the gas produced, or for a portion of such gas, in such condition as to enter the market, i. e., in such condition as to fulfill the requirements of the gas sales contract and thus be taken into the gas pipeline system of Southern Natural. Consistent with the opinion of the Acting So-

licitor * * * (64 I.D. 76) such deductions cannot be allowed for the purpose of computing royalties."

The Deputy Solicitor, Department of Interior, in his opinion dated February 20, 1959, upholding the decision of the Acting Director, ruled as follows:

"The company contends that neither the leases nor the regulations applicable thereto support the disallowance of these deductions. It contends that its obligation is to pay royalty to the United States on the net value of the gas and that the deductions made were for something other than production costs. Presumably, it feels that these deductions are in the nature of charges for either processing or marketing the gas, neither of which, it contends, it is required to bear.

* * * * * *

"As we understand the present appeal, no contention is made that any of the gas is 'manufactured' as that term is used in the regulations. The product involved is gas which is sold for 12 cents per 1000 cubic feet, after it has been gathered to the point of delivery in the field designated in the sales contract and after so much thereof as requires it has been dehydrated and compressed to a condition suitable to enter the buyer's line. Whether these functions be called processing or marketing functions, they are certainly not 'manufacturing' functions as that term is used in the leases and the oil and gas operating regulations. They are in the opinion of the Department and under The Texas Company decision, functions necessary to place the product—gas—in a marketable condition. They are obligations of the lessee.

" * * * The provision in the present leases that the amount or value of gas shall be 'net' after an allowance for the cost of manufacture cannot be read, as the appellant contends, to provide for the deduction of costs other than those of

manufacture. The appellant is attempting to read the provision as if, in the absence of any cost of manufacture, the cost of placing the product in a marketable condition for sale in the field is deductible. Such is *not the meaning of the above-quoted provision of the leases* involved in this Appeal. The interpretation placed on the leases by the Acting Director, Geological Survey, is consistent with the established policy of the Department \* \* \*."

■ As noted by the defendant in his brief, the contract having reserved to the Secretary the right to establish the basis for the computation of royalties, his determination should be sustained in the absence of fraud, bad faith, etc.[3] See Continental Oil Co. v. United States, supra, affirming United States v. General Petroleum Corp., supra; United States v. Ohio Oil Co., supra; Cf. Wilbur v. Texas Co., 1930, 59 App.D.C. 275, 40 F.2d 787.

It has been determined that the Secretary has wide latitude in making value determinations under oil and gas leases. United States v. General Petroleum Corp., supra. The courts have also determined that the Secretary's discretion is greater when a controversy exists between private interests on the one hand and the Secretary, as guardian of the people, on the other, than when the Secretary is involved in a dispute between two private interests.[4] Seaton v. Texas Co., 1958, 103 U.S.App.D.C. 163, 256 F. 2d 718. While the courts have reversed the determinations of the Secretary in certain instances, normally it has been

done only when his actions have been found to be unreasonable or plainly wrong. Chapman v. Sante Fe Pac. R. Co., 1952, 90 U.S.App.D.C. 34, 198 F.2d 498, certiorari denied 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361. This Court is of the opinion that due deference must be given executive judgment and that executive expertise cannot be ignored unless clearly wrong.

The statute here is directory with respect to the Secretary setting a royalty which "shall not be less than 12½ per centum in amount or value of the production." This he claims to have done.[5]

On the other hand, if the Secretary made a computation of royalty on a cost accounting basis, it is apparent he would encounter many problems as to what costs to include, which to exclude, and at what stage the gas would be so-called "production." Moreover, the lease. did not call for such a computation. This is not to suggest that he take the easy way out and compute royalty on the contract price, which includes some, but not uniform m. c. f. costs of preparing the gas for production or marketing, merely because it involves less work for the Supervisor. However, it cannot be said here that using a base that is the same as the contract price of 12¢ is, as a matter of law, not the "value of production". It would appear that the Secretary could have, in his discretion, established some other price as the value of production that would have satisfied the statute. However, it cannot be said that he is clearly wrong in establishing a price, as the value of production, which is the same price as the contract price. For,

---

3. See United States v. General Petroleum Corp., D.C.S.D.Cal.1946, 73 F.Supp. 225, 253, where it is stated: "The court concurs in the test established by the cases . cited above, and holds that the Secretary's value determinations must be sustained unless it has been established by the evidence that the Secretary was guilty of fraud, dishonesty, or bad faith, or that the exercise of judgment was capricious or so unreasonable as to be incapable of justification on any rational basis."

4. Of course, in this case the Court is asked to direct an entry of a judgment for a reduced royalty to the Government against the will of the Secretary.

5. Plaintiff acknowledges that 70% of the production here does not require compression which costs 4.5¢ per m. c. f. Therefore, to say that the Secretary is computing the royalty on this cost for all the gas is inaccurate.

the value, or market price, of the gas, or production, is clearly evident in the condition at which it is sold or marketed and therefore, the Secretary's determination may be said to have a rational basis.

Plaintiff meanwhile contends, in its supplemental brief, that no determination of the reasonable value of gas was ever made by the Secretary and no hearing was ever held. However, discussions were held between the Supervisor and the representatives of Plaintiff since 1953, and much correspondence was exchanged. The Supervisor wrote a letter to his superiors on June 19, 1957, explaining the reasons for his decision, and the Acting Director and the Secretary, in their opinions, have given reasons for their decisions. This, taken together with the billing to the plaintiff for 12¢, is considered to be sufficient determination of value.[6]

There is no showing of any special hardship placed on the plaintiff by reason of the basis set for the royalty computation; and indeed, if there has been, the contract (in section 2(d) (4)) provides for procedures for seeking reductions in such cases.

The Secretary here (and in The Texas Company case, supra) has chosen to interpret the term "production" as meaning all the gas in a marketable condition after it has gone through the operational procedures of separation, compression, and dehydration, such that it meets the buyer's minimum requirements. He then assigns a value of production of 12¢, which is the same as the contract price. The Court can find no fraud, dishonesty, arbitrariness, nor capriciousness in such a determination. It may be that it is harsh, but for such a reason the Court would not impose its judgment upon that of the Secretary.[7]

In its final analysis, the question of the Secretary's determination of "value of production" appears to be one of mixed law and fact. To the extent it is factual, the Court will not interfere with it.[8] To the extent that a question of law is involved, the Court is satisfied that the Secretary acted within his statutory and regulatory authority, and that he exercised his discretion in this matter on a rational basis, and that his determination is not in contravention of the lease.

Accordingly, the Court finds that the Secretary was within his lawful authority in collecting the royalties in the amount of 12¢ per m. c. f. in this case.

The Court denies the injunctive and other relief sought by plaintiff.

Counsel for defendant will submit findings of fact in accordance with this opinion and will submit an appropriate order.

---

6. It would seem that administrative procedures could be adopted by the Secretary to insure that lessees are fully advised in writing of reasons for determinations of value of gas productions and that some evidence of any hearings, informal or otherwise, be incorporated in the record in the event of possible appeal.

7. Plaintiff relies upon certain interpretations of the regulations made by Acting Secretary West in 1937, 56 I.D. 462. It is true, as the defendant points out, that the Acting Secretary was placing an interpretation on the regulations which increased the Government's royalties.

Also, the defendant did not find that interpretation applicable in this case.

8. In Wann v. Ickes, 1937, 67 App.D.C. 291, 92 F.2d 215, 217, the Court said: " * * * [The] finding of fact by the Secretary is the vital point upon which the plaintiff's case must stand or fall. It is too well settled to require citation of authority that the determination by the Secretary of a question of fact, in a matter within his jurisdiction, is binding upon the courts. Nor will the courts entertain any inquiry as to the extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination."